NO. 07-07-0035-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



JANUARY 23, 2008


______________________________



H. SCOTT NORVILLE, PAMELA EIBECK, ELIZABETH HALL, APPELLANTS


V.


R. SCOTT PHELAN, APPELLEE


_________________________________


FROM THE 237TH DISTRICT COURT OF LUBBOCK COUNTY;


NO. 2005-532,489; HONORABLE SAM MEDINA, JUDGE


_______________________________



Before CAMPBELL and HANCOCK and PIRTLE, JJ.



MEMORANDUM OPINION




 Appellants, H. Scott Norville, Pamela Eibeck, and Elizabeth Hall, appeal from an
order denying summary judgment in their favor. By a single issue, Appellants contend the
trial court erred by failing to grant their motion for summary judgment as to all claims (1)
because the evidence conclusively established that they were entitled to the protections
of official immunity. Believing Appellants have established that they are entitled to official
immunity as to some claims, but not all claims, we affirm in part and reverse and render
in part.

 Factual and Procedural Background


 In October 1998, Dr. James McDonald, the Chair of the Department of Civil and
Environmental Engineering at Texas Tech University, offered Appellee, R. Scott Phelan,
a Research Assistant Professor position. Phelan accepted the position and started work
in December 1998. 

 Under the Texas Tech Regents' Rules, appointments are either continuing
appointments, probationary appointments that may lead to the admission to tenure, or
special full-time appointments which do not lead to tenure. Phelan's position was
designated as a special full-time appointment. As such, he could not acquire tenure if he
remained in that position. However, if he served six years as a Research Assistant
Professor, Phelan would be entitled to be dismissed only for cause and he would be
entitled to due process procedures conforming with the faculty grievance procedure.

 In 2001, Phelan accepted a new position as an Assistant Professor for the academic
year running from September 1, 2001 through May 31, 2002. Although his appointment
was probationary, this position could lead to admission to tenure. (2) Under the Regents'
Rules, all faculty members must complete a probationary period before acquiring tenure. 
Before the end of the sixth year of the probationary period, an untenured Assistant
Professor must be notified in writing either that tenure has been awarded or that the
appointment will not be renewed at the end of the seventh year. Computation of the six
year probationary period commences upon a faculty member's initial appointment to a
tenure-eligible rank such as Assistant Professor. Thus, if Phelan continued to serve as a
tenure-eligible Assistant Professor, he would be entitled to notification whether he was
tenured by the Fall of 2007. 

 In September 2003, Dr. H. Scott Norville was appointed Interim Chair of the
Department of Civil and Environmental Engineering at Texas Tech University. In July
2004, Norville was promoted to Chair of that Department. In each capacity, Norville
supervised and evaluated all faculty members within that Department. 

 Norville first evaluated Phelan's performance in his Annual Faculty Evaluation dated
February 24, 2004. At that time, Norville indicated that, although Phelan had a lighter than
average teaching load, he had a moderately large amount of externally funded research. 
Norville further noted Phelan was nearing the midpoint of his probationary period with no
journal publications. He stated if Phelan wished to achieve tenure and promotion, he
needed to produce journal publications. He also observed Phelan had a lack of focus and
advised him to submit research proposals to funding organizations other than the Texas
Department of Transportation (TxDOT). 

 In May 2004, Pamela Eibeck became Dean of the College of Engineering. Shortly
thereafter, she met with all her faculty members to learn more about their backgrounds and
research expertise. During her meeting with Phelan, she became concerned that his
resume reflected few peer-reviewed journal publications. She shared this concern with
Norville. 

 During Fall 2004, Norville appointed a committee of tenured faculty to perform a
"mid-tenure review" of Phelan's performance. In November 2004, Phelan received the
committee's evaluation. The evaluation complimented Phelan on his preparation of a
detailed record of his accomplishments, noted that he was regarded as an asset to the
Department, and acknowledged that his expertise in bridge engineering brought depth to
the structure group. Phelan also received high student evaluations for teaching and he
was recognized for obtaining a substantial amount of research funding. Although he had
devoted a lot of attention to writing reports related to his research grants, the Committee
observed he had given little attention to transforming his research into archival journal
publications. (3) The Committee commended Phelan for his recent efforts in this regard but
noted this had been a consistent comment in his last three annual reviews and should now
receive the highest priority. 

 Phelan met with Norville regarding his mid-tenure review. Norville also indicated
Phelan needed to make more journal publications and he eased Phelan's teaching load
so he could complete his research reports for TxDOT. Norville indicated if Phelan did not
complete his overdue TxDOT reports, he would be asked to leave. 

 In March 2005, Phelan received his second Annual Faculty Evaluation from Norville. 
Although Phelan's teaching evaluations had risen considerably, he had no continuing
research projects and no new research projects. Phelan continued to work on finishing
three TxDOT reports from past projects and was awaiting approval on a fourth report
submitted in 2005. The evaluation noted Phelan was the first author on a paper accepted
by a journal and had several more papers under submission. Phelan was urged to reduce
his service commitment in deference to focusing on activities that would aid him in
achieving tenure and promotion. The evaluation emphasized that a successful faculty
member must not only teach well but should also pursue external funding, mentor graduate
students, advise undergraduate students, perform routine departmental duties, and publish
in archival journals in order to achieve tenure and academic advancement. 

 On March 10, 2005, Phelan met with Norville to discuss the evaluation. Norville
expressed his displeasure at Phelan's continued lack of publications, his failure to
complete outstanding TxDOT reports, his absence from the office except when teaching
class, and his failure to submit proposals for funded research. He praised Phelan on the
dramatic improvement in his course evaluation scores during 2004 and his service
commitment. However, he advised Phelan that his service commitment was too high and
did not constitute the best use of his time in attempting to achieve tenure. Norville
requested Phelan to sign a copy of his evaluation to indicate that he received a copy of it. 
Phelan refused to sign the evaluation because he believed it contained misleading
statements. 

 On March 11, 2005, Phelan initiated an exchange of e-mails lasting several days. 
Phelan sought a second meeting with Norville to discuss the relationship generally between
publications and tenure. At that time, Phelan noted that he had submitted his application
to another university and was on their short list. Phelan also indicated that he had
concluded from their meeting that it was not going to be possible for him to remain at
Texas Tech. In a subsequent e-mail, Phelan described his evaluation as inaccurate,
attached a four-page rebuttal letter proposing numerous changes, and requested the letter
be placed in his file. He took issue with Norville's statement that Phelan had basically
ceased conducting funded research and requested a counter statement to the effect that,
in 2004, Norville had strongly urged Phelan to "get rid" of his TxDOT research. 

 Norville next discussed Phelan's attitude and performance with Dr. Heyward
Ramsey, Civil Engineering Associate Department Chair. It was determined that Drs.
Ramsey and Ken Rainwater should meet with Phelan. At a regularly scheduled meeting,
Eibeck mentioned to Norville that Phelan had made several accusations against Norville 
including an assault that was alleged to have occurred in the Fall of 2004. She suggested
Norville not meet with Phelan unless a witness was present.

 On March 29, 2005, Phelan met with Norville a second time to discuss a revised
draft of his 2004 Annual Faculty Evaluation. Norville's administrative assistant also
attended the meeting. Little progress was made toward any agreement on a final draft. 
During the meeting, Phelan indicated that the number of reports he owed to TxDOT had
increased. After the meeting, Phelan received an e-mail from Ramsey requesting a
meeting to discuss whether Phelan was going to remain at Texas Tech. Phelan, Ramsey,
and Rainwater met, at which time Phelan told them about the alleged assault. 

 In April 2005, Norville met with Drs. Ramsey, Rainwater, and Jayawickrama. They
discussed Phelan's failure to complete TxDOT reports, his lack of publications, and his 
work attitude. The consensus at the meeting was Phelan should seek other employment
because of his lack of satisfactory progress toward tenure.

 Norville informed Eibeck that he wanted to consider non-reappointment because
Phelan was an unlikely candidate for tenure. In late April, Eibeck concurred with Norville's
recommendation and informed the Provost's Office that she and Norville might recommend
Phelan not be reappointed. Norville contacted Victor Mellinger, Senior Associate General
Counsel for Texas Tech, to ask him about the process of issuing a notice of non-reappointment. Mellinger referred Norville to Vice Provost Elizabeth Hall. (4) 

 In early May 2005, Norville contacted Hall to discuss his latitude as a department
chair to dismiss Phelan. Norville described Phelan as a faculty member who was not
making adequate progress toward tenure and was not being responsive to the stipulations
of a major granting agency. Hall agreed there was a legitimate basis for Phelan's non-reappointment and that the non-reappointment would be supported by Texas Tech
policies. The Provost's Office concurred with Phelan's non-reappointment, and advised
Norville to offer Phelan the opportunity to resign or be non-reappointed. 

 Norville later scheduled a lunch with Phelan and on May 9, 2005, Norville, Ramsey,
and Phelan met at a local restaurant. During lunch, Norville offered Phelan the opportunity
to either resign or be non-reappointed. Following the lunch, Phelan understood his two
options were to resign or be fired.

 On May 11, 2005, Phelan sent Norville an e-mail initiating a series of
communications. Phelan requested clarification on Norville's ability to non-reappoint him,
accused Norville of violating the Faculty Handbook, violating his duty of public trust,
furnishing false information to Texas Tech, physical abuse, and indecent conduct by telling
crude and offensive jokes, and by using demeaning language. Phelan also complained
Norville should have delivered his ultimatum in the privacy of an office rather than a public
restaurant. Norville denied each accusation and indicated Phelan's style was offensive. 
Norville indicated if Phelan could find faculty support for any of his accusations, he should
proceed. Norville also indicated that the May 9, 2005, meeting was held in a public place
because he believed it would encourage restraint on everyone's part. 

 Phelan responded that Norville's ultimatum was insulting, retaliatory, vindictive, and
illegal. He accused Norville of terminating him because he disagreed with Norville's 2004
assessment of his performance. Norville replied he was not acting alone and had
previously conferred with the Dean and Provost's Office. Phelan responded by threatening
to sue Norville because his actions were beyond the scope of his duties at Texas Tech and
an abuse of power. He further stated Norville would be receiving a subpoena for his
records, suggested Norville discuss the matter with his attorney, seek advice regarding "the
consequences of spoliation of evidence" and how the consequences would apply to other
faculty members, staff, and his consulting partners and employees. Phelan also sent an
e-mail informing many of the civil engineering faculty, several staff members, and persons
outside of the Department that he intended to sue Norville. 

 On May 14, 2005, Senior Associate Dean Ernest Kiesling met with Phelan. Kiesling
admitted Norville had an abrasive style but wanted to know if there was any way Phelan
would arbitrate his complaints related to Norville and reset the tenure process. Meanwhile,
Eibeck asked Norville to draft a statement recommending Phelan's non-reappointment. 
During the drafting process, Eibeck provided comments to Norville by e-mail (5) as follows:

 I read your statement. My suggestion is that you change the Introduction to
be more of an Executive Summary that gives a succinct set of reasons to let
Phelan go. Too much of the document sounds like "I couldn't get along with
the creep so I am firing him." Make it clear that 1. He is minimally performing
on the job with examples and then 2. His actions reflect dysfunctional
behavior with examples. Emphasize the most significant issues to the
institution first vs. The ones that bother you most. For example, the fact that
he would come to see me without first notifying you is trivial to a Provost.

 

 On May 19, 2005, Phelan went to the District Attorney's Office in Lubbock to report
an alleged assault on his person by Norville in the Fall of 2004. The DA's office informed
Phelan he would have to report the incident to the Lubbock Police Department who then
referred Phelan to the Texas Tech Police. Phelan then filed an assault complaint against
Norville with the Texas Tech Police. 

 On May 20, 2005, Marcy, Hall, Mellinger, Eibeck, Kiesling, and Norville met to
discuss the proper procedure for issuing Phelan's notice of non-reappointment. During
that meeting, a Texas Tech Police Officer brought them a copy of Phelan's assault
complaint against Norville. Other than reviewing the contents of the complaint, the report
was not discussed at the meeting. On May 26, 2005, Texas Tech Police informed Norville
they had completed their investigation of Phelan's assault complaint and would not pursue
any charges. 

 Eibeck and Norville subsequently delivered a letter dated May 26, 2005, to Phelan 
informing him of his non-reappointment as a tenure-acquiring faculty member, and offered
him a terminal appointment for the '05-'06 academic year. Per the letter, Phelan's last day
of employment would be May 31, 2006. (6) The basis for Phelan's non-reappointment was
his failure to submit timely reports to his primary research sponsor, TxDOT, his lack of
journal publications, and his inability to carry out simultaneously varied tasks required of
a tenure track faculty member. 

 Per the Regents' Rules and Faculty Handbook and Operating Procedures, Phelan
was not eligible for tenure at the time of his non-reappointment in May 2005. He had not
completed the probationary period of six years, and the Board of Regents had not admitted
him to tenure. Because Phelan had served only three years as a Research Assistant
Professor and three years as an Assistant Professor on a tenure track, he had attained no
particular employment status entitling him to continued employment under Texas Tech's
policies and procedures. 

 Under the Regents' Rules, full-time untenured faculty members, such as Phelan,
with more than two years employment are entitled to notice of non-reappointment by
issuance of a terminal contract for one academic year. Texas Tech is not required to give
a reason for a decision of non-reappointment. However, if the faculty member alleges that
a decision not to reappoint was caused by considerations violative of academic freedom,
for constitutionally impermissible reasons, or for significant noncompliance with Texas
Tech's established standards or prescribed procedures, the allegations are given
preliminary consideration by a Faculty Committee appointed by the Tenure Advisory
Committee (TAC). (7) If the Faculty Committee concludes that an allegation is supported by
probable cause, the Tenure Advisory Committee notifies the Provost and convenes a
Hearing Committee where the matter is heard with procedures outlined in the Regents'
Rules. If the Faculty Committee determines that probable cause does not exist, no further
action is taken and the non-reappointment stands.

 Phelan sought review of his non-reappointment before the TAC and submitted a
memorandum to the Provost's Office. His memorandum contained a statement of facts,
an analysis of his request for review, his request for relief, and de facto tenure presentation
with a discussion of the Regents' Rules. His resume was also attached with various
exhibits. 

 Phelan also filed a grievance against Norville with the President's Office dated May
31, 2005. The grievance contained a statement of facts discussing his grievance and
requested relief. (8) Ron Phillips, a representative of the President's Office, told Phelan that
he should first present his grievance against Norville to Eibeck. 

 As Vice Provost and ex-officio TAC member, Hall was responsible for scheduling
a faculty committee meeting to review Phelan's non-reappointment. Hall was also
responsible for providing TAC and the faculty committee with relevant information,
including an initial briefing on Texas Tech policy governing their fact finding and
deliberation. Prior to scheduling the meeting or briefing, Hall sent TAC's members a copy
of Phelan's submission. (9) 

 On June 23, 2005, Eibeck met with Phelan, Phelan's father, and Kiesling to discuss
Phelan's grievance. Following their meeting, Eibeck anticipated Phelan would file suit
against Norville and Texas Tech. At Phillips's request, Eibeck drafted a response to
Phelan's grievance. On June 29, 2005, Eibeck circulated her draft response to Norville,
Phillips, Mellinger, and Hall. She requested they review her draft and comment whether
she sufficiently and appropriately addressed the issues. 

 In his response to Eibeck's request, Norville offered to submit his resignation if
Phelan would also tender his resignation and sign an agreement to suspend further legal
action against Norville and Texas Tech. In response to Eibeck's refusal to accept a letter
of resignation, Norville commented that he was not really ready to step down and just
"thought a little skullduggery might work." (10) 

 In the process of reviewing Eibeck's draft response to Phelan's grievance, Hall
realized many of Phelan's allegations seeking TAC's review of his non-reappointment were
also addressed in Eibeck's draft response to Phelan's grievance. She called Mellinger to
determine whether Texas Tech policy precluded her from presenting Eibeck's response
to TAC. Mellinger advised Hall if TAC wanted to review the document, there was no policy
preventing them from doing so because the tenure policy calls for TAC to make their own
rules on how information is gathered. 

 On June 29, 2005, TAC met to review Phelan's non-reappointment. The meeting
was attended by Sue Couch, Fred Suppe, Steve Sears, Lynn Huffman, Ben Shacklette,
and Hall. (11) Hall brought Eibeck's draft response, explained what the document was, and
advised TAC the document contained both relevant and nonrelevant information. She
asked whether they wanted to consider Eibeck's draft response or have the information
gathered through interviews or written responses. She also advised it was within TAC's
discretion to review Eibeck's draft response if they believed the document would assist
them in rendering their decision. TAC chose to review Eibeck's draft response. After
meeting for approximately thirty-five minutes, TAC unanimously upheld Phelan's non-reappointment. By letter dated August 12, 2005, Phelan submitted his resignation from Texas
Tech. On August 17, 2005, using his Texas Tech e-mail account, Phelan sent an e-mail
related to his resignation to faculty members and staff throughout the Department. 
Phelan's e-mail accused Norville of publicly shouting at him, calling Phelan a "slave,"
slamming a door in his face, slapping him twice without warning, and intentionally
misrepresenting his performance to the Dean and other faculty. Phelan also announced
he intended to sue Norville. Rainwater responded and assured everyone that Phelan's
e-mail did not properly represent the complete story and indicated Phelan's e-mail
bordered on slander. Phelan responded truth was a defense to slander and they should
be aware they were not immune from slandering him.

 Norville forwarded Phelan's e-mail to Mellinger and others to find out if Phelan's e-mail privileges at Texas Tech could be suspended and whether Norville should attempt
to seek an injunction to stop such comments in the future. Marcy forwarded the e-mail
to Sam Segran and asked him to determine the applicable Texas Tech procedures in
such a case and whether Phelan had an alternative ISP provider where they could forward
Phelan's e-mails. After some back and forth, Eibeck sent an e-mail to Segran, Mellinger,
and Marcy stating:

 While Scott Phelan has technically resigned, in reality, he was given a
terminal contract (last day next May consistent with university policy) and
he chose to resign in response. He has threatened lawsuits and has sent
accusatory emails to all faculty and staff in the department. It is certainly
possible that he would use his e-raider account to continue this hostile
behavior as well as cause harm to the institution.


 Hence, please disable Scott Phelan's e-raider account effective at the end
of this Friday, August 19, his last day of employment.


 We do not know his personal email address and given his hostile behavior,
I don't want us to inform him in advance of this action for fear of damage
that could be done between now and when the account is closed. My office
will send a brief letter to his home address informing him that his emails will
be transferred to his personal email account as soon as he informs
someone in IT of the personal email account.


 Segran responded Phelan's e-mail account would be disabled the next day per
Eibeck's request. Segran indicated disabling the account was "a prudent move to protect
university resources" and the "action [was] in line with other cases."

 In the Fall of 2005, Norville received an e-mail from a third party expressing regret
for what was occurring in the Department because of Phelan's lawsuit. (12) The third party
asked why Phelan resigned, and on November 28, 2005, Norville responded as follows:

 There were reasons beginning with the fact that after five (5) years, Dr.
Phelan had no journal publications. When I tried to get him to publish, his
response was nasty at best. Following that, I found out that Dr. Phelan was
not even writing reports to his research sponsor, TxDOT, and, hence hurt
TechMRT's chances of getting funded research. We can see what happens
for the summer, but I repeat that the salary will not even pay your air fare
alone.


 In January of 2006, Phelan petitioned the district court for a pre-suit order to
depose numerous Texas Tech employees in order to investigate potential claims. 
Thereafter, Phelan amended, and later supplemented, his petition to allege a myriad of
claims against Appellants and Victor Mellinger, based upon various legal theories (13)
relating to five general factual categories: (1) claims related to Phelan's assault
allegations, (2) claims related to his non-reappointment, (3) claims related to his TAC
appeal, (4) claims related to the termination of his e-mail account, and (5) claims related
to Norville's November 28, 2005 e-mail. The parties filed competing motions for summary
judgment. Without specifying any grounds, the trial court issued an order granting
Mellinger's motion for summary judgment, denied Appellants' motion for summary
judgment in part as to the assault claim asserted against Norville, and reserved ruling on
Appellants' motion as to all other claims asserted. Thereafter, again without specifying
any grounds, the trial court issued a second order denying the remainder of Appellants'
motion for summary judgment. Appellants then brought this appeal contending the trial
court erred in denying their motion for summary judgment on all claims asserted by
Phelan (except the assault claim asserted against Norville only) because the evidence
conclusively demonstrated Appellants acted (1) within the scope of their generally-assigned duties, (2) in exercising discretion and independent judgment, and (3) in good
faith, thereby entitling each Appellant to the protections of the official immunity defense.Standard of Review 

 We review the trial court's granting of a summary judgment de novo. Valence
Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005). A review of the denial of a
motion for summary judgment where there is an assertion of official immunity is governed
by the same standard as governs review of the granting of such a motion. Welch v.
Milton, 185 S.W.3d 586, 593 (Tex.App.-Dallas 2006, no pet.). 

 Because official immunity is an affirmative defense, to obtain summary judgment
on official immunity, the governmental employee must conclusively prove each element
of the defense. Gray County v. Shouse, 201 S.W.3d 784 (Tex.App.-Amarillo 2006, no
pet.). A "matter is conclusively established if ordinary minds could not differ as to the
conclusion to be drawn from the evidence." McCartney, M.D. v. May, M.D., 50 S.W.3d
599, 604 (Tex.App.-Amarillo 2001, no pet.). Once the defendant meets this initial burden,
the plaintiff must submit or identify evidence in the record raising a genuine issue of
material fact as to the defense. Tex. R. Civ. P. 166a. A fact is "material," if it might affect
the outcome of the suit under governing law, and an issue is "genuine" if it is real and
substantial, as opposed to merely formal, pretended, or a sham. Bazan v. Hidalgo
County, 246 F.3d 481, 489 (5th Cir. 2001). 

 We take as true all evidence favorable to the nonmovant while indulging every
reasonable inference and resolve any doubts in the nonmovant's favor. Sudan v. Sudan,
199 S.W.3d 291, 292 (Tex. 2006). However, the nonmovant may not raise a genuine
issue of material fact by submitting conclusory allegations, unsubstantiated assertions,
improbable inferences, or unsupported speculation. See See First Union Nat. Bank v.
Richmont Capital Partners I, L.P., 168 S.W.3d 917, 930 (Tex.App.-Dallas 2005, no pet.). Official Immunity Defense

 Common law official immunity is based on the necessity of public officials to act in
the public interest with confidence and without the hesitation that could arise from having
their judgment continually questioned by extended litigation. Ballantyne v. Champion
Builders, Inc., 144 S.W.3d 417, 424 (Tex. 2004). Unlike sovereign immunity, the doctrine
of official immunity is not a bar to suit or a jurisdictional issue. See McCartney, M.D., 50
S.W.3d at 603. Rather, the affirmative defense is a bar to liability and shields the party
claiming official immunity from individual liability for the claims asserted in the suit. 
Telthorster v. Tennell, 92 S.W.3d 457, 460 (Tex. 2002).

 To establish their right to summary judgment on official immunity, Appellants have
the initial burden to conclusively prove that the actions which form the basis for Phelan's
suit arise (1) from the performance of duties within the scope of their authority (2) that
were discretionary and (3) exercised in good faith. Gray County v. Shouse, 201 S.W.3d
784, 786 (Tex.App.-Amarillo 2006, no pet.) citing University of Houston v. Clark, 38
S.W.3d 578, 580 (Tex. 2000). In determining whether an official's summary judgment
evidence conclusively establishes the defense, we must determine whether there are
disputed facts material to its elements. Telhorster, 92 S.W.3d at 460-61.

 Once the official has established his entitlement to immunity as a matter of law, the
burden shifts to the plaintiff to show that "no reasonable person in the defendant's position
could have thought the facts were such that they justified defendant's acts." McCartney,
M.D., 50 S.W.3d at 605 (emphasis added) quoting City of Lancaster v. Chambers, 883
S.W.2d 650, 657 (Tex. 1994). It should be noted, however, that official immunity "may not
be rebutted by evidence that the defendant's conduct was malicious or otherwise
improperly motivated." Ballantyne, 144 S.W.3d at 427-28.

 1. Scope of Official's Authority

 Public officials act within the scope of their authority if they are discharging the
duties generally assigned to them; Ballantyne, 144 S.W.3d at 425, and the fact an act
that forms the basis of the suit was performed improperly or negligently does not take the
act outside of the scope of authority. Wethington v. Mann, 172 S.W.3d 146, 152
(Tex.App.-Beaumont 2005, no pet.).

 Phelan contends Appellants acted outside the scope of their authority because they
engaged in acts Phelan alleged were wrongful. Phelan misconstrues this prong of the test
for official immunity. So long as Appellants were "discharging duties generally assigned
to them," they were acting in an official capacity. See Bagg v. University of Texas Medical
Branch at Galveston, 726 S.W.2d 582, 587 (Tex.App.-Houston [14th Dist.] 1987, writ ref'd
n.r.e.). Phelan's reasoning was rejected by the Supreme Court in City of Lancaster v.
Chambers, 883 S.W.2d 650 (Tex. 1994), where the Court made clear that the focus is not
on whether the official had authority to perform an allegedly wrongful act, but on whether
the official is performing the duties generally assigned to him when the act occurs. Id. at
658. 

 A. Norville

 Norville's duties included evaluating Phelan's performance and tenure prospects. 
As Phelan's primary supervisor, his authority also included making personnel
recommendations such as non-reappointment and informing Phelan that he had the
option of resigning or being terminated. Non-reappointment is an option department
chairs can exercise before tenure, and department chairs and deans are responsible for
hiring and retaining faculty. Norville was acting within the scope of his authority when he
engaged in acts related to Phelan's evaluation and non-reappointment. Furthermore,
Norville's involvement in Phelan's TAC appeal and grievance were administrative
responsibilities within the scope of his authority. 

 There is, however, no summary judgment evidence tending to establish whether
Norville was acting in an official capacity when he sent the e-mail dated November 28,
2005, to a non-university related third party stating, "Dr. Phelan had no journal
publications." Accordingly, we find that, with the exception of the e-mail dated November
28, 2005, competent summary judgment evidence established that Norville was acting
within the scope of his authority when he engaged in acts complained of by Phelan. 

 B. Eibeck

 As Dean, Eibeck was responsible for the day-to-day operation of the College of
Engineering including reviewing and approving personnel matters. Her duties included
participating in Phelan's evaluation, non-reappointment, and TAC appeal. Furthermore,
Eibeck was acting within the scope of her authority when she recommended that Phelan's
Texas Tech e-mail account be disabled. Accordingly, we find that competent summary
judgment evidence established that Eibeck was acting within the scope of her authority
when she engaged in acts complained of by Phelan.

 C. Hall 

 As Vice Provost, Hall was responsible for providing assistance to academic units
with regard to faculty hiring, budget information, and representation of the Provost to
various counsels and committees. As an ex-officio TAC member, Hall was responsible
for scheduling, providing TAC with information relevant to their deliberations and briefing
TAC on issues under consideration and Texas Tech policies and rules applicable to TAC's 
deliberations and decisions. Therefore, Hall's presentment of Eibeck's draft response to
Phelan's grievance to TAC was within the scope of Hall's administrative responsibilities. 
Furthermore, Hall handled issues related to all faculty affairs and she provided support
for committees serving in the tenure advisory role and reviewed draft documents to assure
the documents followed Texas Tech policy. The Provost's Office provided this service for
all deans and department chairs on issues related to tenure such as non-reappointments. 
Accordingly, we find that competent summary judgment evidence established that Hall
was acting within the scope of her authority when she engaged in acts complained of by
Phelan. 

 Because the acts of Norville, Eibeck, and Hall at issue were within the duties
generally assigned to them, and because Phelan has not submitted or identified any
summary judgment evidence raising a genuine issue of material fact as to this element
of the official immunity defense, except the November 28, 2005 e-mail, Appellants have
satisfied the first prong as to all complained of acts, save and except that e-mail.

 2. Discretionary v. Ministerial Acts

 Official immunity extends to any action or decision by a state employee that is
"discretionary." Kassen, R.N. v. Hatley, 887 S.W.2d 4, 9 (Tex. 1994). Discretionary
functions receive protection while ministerial acts are unprotected. Id. An official duty or
function is discretionary if the action involves personal deliberation, decision, and
judgment. Ballantyne, 144 S.W.3d at 425-26. However, the test to determine whether
a governmental employee's act is discretionary is not whether the employee has discretion
to perform an allegedly wrongful act, but whether the employee is performing a
discretionary function when committing that act. City of Lancaster, 883 S.W.2d at 654.

 Ministerial acts are "acts that the law prescribes and defines the duty to be
performed with such precision and certainty as to leave nothing to the exercise of
discretion or judgment." If the public official must obey an order, without having any
choice of complying, the act is ministerial. Id. 

 More than fifty years ago, the Supreme Court recognized a good faith immunity for
public officials charged with the discretionary duty of renewing or terminating teacher
employment contracts. Campbell v. Jones, 153 Tex. 101, 264 S.W.2d 425, 427 (1954). 
See also Dalrymple v. University of Texas System, 949 S.W.2d 395, 400 n.2
(Tex.App.-Austin 1997) (noting that compilation of annual tenure evaluations of university
professors is discretionary because it involves personal deliberation, decisions, and
judgment), rev'd in part on other grounds, Brewerton v. Dalrymple, 997 S.W.2d 212 (Tex.
1999). Furthermore, employment actions related to hiring and supervision are
discretionary. Dovalina v. Nuno, 48 S.W.3d 279, 282 (Tex.App.-San Antonio 2001, no
pet.). 

 A. Norville and Eibeck

 Norville and Eibeck were engaging in a discretionary function when they
recommended and sought Phelan's non-reappointment. Prior to recommending Phelan's
non-reappointment, Norville and Eibeck assessed his performance and qualifications
before deliberating and reaching a decision Phelan was an unlikely candidate for
reappointment or tenure. Furthermore, Eibeck was involved in a discretionary act when
she recommended that Phelan's Texas Tech e-mail account be disabled. 

 B. Hall 

 Hall's presentment of Eibeck's draft response to Phelan's grievance to TAC was
also a discretionary act. She was not required to present the document to TAC by any
Texas Tech policy, procedure, or order of the Provost. Rather, in the process of
assessing whether Eibeck's response complied with Texas Tech's policies and
procedures, Hall recognized many of the issues raised by Phelan in TAC's review of his
non-reappointment were addressed by Eibeck in her draft response to his grievance. 
Based on her review, she made a determination the document was relevant to TAC's
deliberations. She then consulted with Texas Tech counsel Mellinger to obtain his opinion
before exercising her discretion to present the document to TAC. Thus, Hall's decision
to present the document to TAC required deliberation, decisions, and judgment. 

 Phelan offers nothing to rebut Appellants' summary judgment evidence except
conclusory statements that an act cannot be discretionary when it is libelous, slanderous,
or in violation of an employee's privacy rights. Because Phelan has not submitted or
identified any summary judgment evidence raising a genuine issue of material fact as to
this element of the official immunity defense, Appellants have satisfied the second prong.

 3. Good Faith

 To determine whether a public official acted in good faith, we apply an objective
standard and inquire whether a reasonably prudent official, under the same or similar
circumstances, could have believed that his conduct was justified based on the
information he possessed at the time of the act. Ballantyne, 144 S.W.3d at 426. To be
entitled to summary judgment, an official must prove that a reasonably prudent official
might have believed the action taken was appropriate, not that it would have been
unreasonable to take different action or that all reasonably prudent officials would have
acted as he or she did. Perry v. Greanias, 95 S.W.3d 683, 697 (Tex.App.-Houston [1st
Dist.] 2002, pet. denied) citing Wadewitz v. Montgomery, 951 S.W.2d 464, 467 (Tex.
1997). 

 The standard of good faith as an element of official immunity is not a test of
carelessness or negligence, legality, or a measure of an official's motivation. Ballantyne,
144 S.W.3d at 426-27; Texas State Technical College v. Cressman, 172 S.W.3d 61, 67
(Tex.App.-Waco 2005, pet. denied), Titus Regional Medical Center v. Tetta, 180 S.W.3d
271, 276 (Tex.App.-Texarkana 2005, no pet.). Official immunity protects "all but the
plainly incompetent or those who knowingly violate the law." McCartney, M.D., 50 S.W.3d
at 605, quoting City of Lancaster, 883 S.W.2d at 656. Evidence concerning the
defendant's subjective intent is simply irrelevant to that defense. Ballantyne, 144 S.W.3d
at 428, quoting Crawford-El v. Britton, 523 U.S. 574, 588, 118 S.Ct. 1584, 140 L.Ed.2d
759 (1998). 

 An official's good faith may be established by the official's own affidavit. Zuniga
v. Navarro & Associates, P.C., 158 S.W.3d 663, 672 (Tex.App.-Corpus Christi 2005, pet.
denied). However, that testimony will support summary judgment only "if the evidence is
clear, positive and direct, otherwise credible and free from contradictions and
inconsistencies, and could have been readily controverted." Tex. R. Civ. P. 166a(c); 
Wadewitz, 951 S.W.2d at 466-67. 

 In Texas, continued employment generally depends upon the will of the employer. 
Jordan v. Jefferson County, 153 S.W.3d 670, 674 (Tex.App.-Amarillo 2004, pet. denied). 
As a general rule, a faculty member's employment is subject to their contract and the
school's operational policies. Bowen v. Calallen Independent School District, 603 S.W.2d
229, 233 (Tex.Civ.App.-Corpus Christi 1980, writ ref'd n.r.e.). Unless there is a specific
agreement to the contrary that dictates otherwise, a faculty member can be released for
"good reason, bad reason, or no reason." Id. Here, Texas Tech's policies, procedures
and rules clearly established that Phelan's nontenured appointment was an at-will
employment pursuant to annual appointments that expired by their own terms. See
Turner v. Joshua Independent School District, 583 S.W.2d 939, 942 (Tex.Civ.App.-Waco
1979, no writ). 

 Moreover, Texas does not recognize implied teaching contracts. See Burris v.
Willis Independent School District, Inc., 713 F.2d 1087, 1090-91 (5th Cir. 1983). Contrary
to Phelan's assertions, the mere fact he had been rehired each year for a period of years
does not constitute evidence Texas Tech had impliedly contracted with him to renew his
contract every year. See Hix v. Tuloso-Midway Independent School District, 489 S.W.2d
706, 710 (Tex.Civ.App.-Corpus Christi 1973, writ ref'd n.r.e.). And, where a university has
published written procedures governing tenure such as Regents' Rules, Faculty Handbook
and Operating Procedures, the legitimacy of a claim to tenure acquired outside the
procedures is vitiated because there is no basis for mutuality. LaVerne v. University of
Texas Systems, 611 F.Supp. 66, 69 (D.C. Tex. 1985) (unless otherwise provided for in
university rules, there is no "common law" tenure, de facto tenure, or tenure by default). 

 A. Norville and Eibeck

 Norville and Eibeck acted in good faith when they engaged in acts relating to
Phelan's evaluation and non-reappointment. Likewise, Norville and Eibeck could not have
acted in bad faith by depriving Phelan of due process because he received all the due
process to which he was entitled. Under Texas Tech's rules on non-reappointment,
Phelan was entitled to notice and the issuance of a terminal contract for one academic
year. He received both. And, at his request, he received review of his non-reappointment
by a faculty committee or TAC. Moreover, simply because Texas Tech provided some
procedure for faculty that are non-reappointed does not mean Texas Tech intended to
expand by implication the employment rights of a faculty member who is non-reappointed
beyond those set forth in the Regents' Rules. See Wells v. Hico Independent School
District, 736 F.2d 243, 254-55 (5th Cir. 1984), cert. dism'd, 473 U.S. 901, 106 S.Ct. 11, 87
L.Ed.2d 672 (1985). Accordingly, Norville and Eibeck did not illegally deprive Phelan of
any due process rights related to his non-reappointment or subsequent review by TAC.

 Nor did Eibeck act in bad faith when she used the words "creep" or "dysfunctional"
in her e-mail to Norville. The question of whether an alleged defamatory statement is
reasonably capable of a defamatory meaning is a question of law. Musser v. Smith
Protective Services, Inc., 723 S.W.2d 653, 654 (Tex. 1987). The statement is construed
as a whole, in light of the surrounding circumstances, based upon how a person of
ordinary intelligence would perceive the statement. Turner v. KTRK Television, Inc., 38
S.W.3d 103, 114 (Tex. 2000). Bearing in mind that an expression of opinion is protected
free speech, we determine whether the statements in question are merely expressions of
opinion or actionable assertions of fact. Simmons v. Ware, 920 S.W.2d 438, 446
(Tex.App.-Amarillo 1996, no writ).

 From the text of her e-mail, it is clear that Eibeck is using the word "creep" in a
figurative sense to convey her criticism that Norville's statement needed to focus more on
Phelan's performance and less on Phelan's behavior. In stating that Phelan's actions
"reflect dysfunctional behavior," Eibeck is expressing an opinion in the popular sense as
opposed to a clinical sense, and as such, is not a statement of fact. Shaw v. Palmer, 197
S.W.3d 854, 857-58 (Tex.App.-Dallas 2006, pet. denied) (statements that plaintiff was
crazy, incompetent, and attempting to ruin the business held not defamatory). 

 Phelan further asserts that Eibeck acted in bad faith when she wrote, in support of
her recommendation that Phelan's Texas Tech e-mail account be disabled, that Phelan
had engaged in "hostile behavior." Given the surrounding circumstances, i.e. Phelan had
only just sent a detailed accusatory e-mail to faculty and staff throughout the Department,
followed by a second e-mail containing a veiled threat to sue other faculty members,
Eibeck's statement was reasonable and justified. Moreover, Eibeck's statement was
protected opinion, not a defamatory statement. Accordingly, Eibeck acted in good faith
when she recommended that Phelan's Texas Tech e-mail account be disabled. 

 B. Hall

 Phelan contends Hall acted in bad faith when she presented Eibeck's draft
response to Phelan's grievance to TAC and hand-picked TAC members who reviewed 
and upheld his non-reappointment. Phelan asserts Hall violated Texas Tech rules and
procedures governing review of his non-reappointment when Hall presented Eibeck's draft
response to TAC. 

 Hall's presentation of Eibeck's draft response to TAC is not prohibited by Texas
Tech's rules or procedures. See supra note 8. In fact, there are no limitations on the
evidence that may be submitted or considered by TAC. Id. Furthermore, she acted 
responsibly when she sought advice from Texas Tech's counsel prior to presenting the
document to TAC. We also reviewed the record and found no evidence that Hall "hand-picked" any of TAC's members. In fact, Texas Tech's rules require TAC's members to be
elected at-large by tenured faculty. Phelan has produced no evidence that such an
election did not take place. Therefore, we conclude Hall acted in good faith when she
presented Eibeck's draft response to Phelan's grievance to TAC.

 Because Phelan has not submitted or identified any summary judgment evidence
raising a genuine issue of material fact as to this element of the official immunity defense,
Appellants have satisfied the third and final prong of official immunity. Accordingly,
Appellants' sole issue is sustained in part and overruled in part.

 Conclusion


 Accordingly, we affirm the trial court's interlocutory order denying summary
judgment in favor of Norville on Phelan's claim for libel and/or slander based upon the
November 28, 2005 e-mail, reverse the trial court's order denying summary judgment in
favor of Appellants on all Phelan's remaining claims, and hereby render judgment granting
Appellants' motion for summary judgment that Phelan take nothing as to those remaining
claims. 


 Patrick A. Pirtle

 Justice 
1. Norville does not appeal the trial court's denial of summary judgment in his favor
on Phelan's assault claim.
2. Under Texas Tech's Operating Policies and Procedures and Regents' Rules, the
general criteria for tenure include an evaluation of a faculty member's abilities related to
teaching, research/creative ability, and professional service. The tenure candidate is
responsible for detailing his accomplishments in a dossier and obtaining the
recommendation of the basic academic unit. Afterwards, there is a detailed procedure of
review starting with the College or School, then by the Provost/Senior Vice President of
Academic Affairs, next by the President, and finally the Board of Regents. 
3. In deposition, Phelan's counsel asked Provost William Marcy to comment on
Phelan's mid-tenure review. Marcy indicated that, if he were presented with the review for
a tenure determination, he would not approve it. He found Phelan's mid-tenure review to
be deficient because Phelan was "first author" on only one of the three peer-reviewed
journal publications. Marcy indicated Phelan needed to be the first author on at least five
or six. He commented Phelan's problems with journal publications would be a
"showstopper" for tenure. 
4. Hall's duties consisted of providing assistance for academic units with regard to
faculty hiring, budget information, and representation of the Provost to various councils and
committees. She was an ex-officio member of the Tenure Advisory Committee, and
advised faculty on tenure issues. Although Hall has subsequently married and changed
her last name to Burns, we refer to her as Hall throughout this opinion.
5. In her affidavit, Eibeck indicated that the e-mail was intended to have Norville
modify his statement to focus more on Phelan's performance and less on Phelan's
behavior. 
6. Marcy and Eibeck also executed a Personnel Action Form (PAF) effective May 31,
2005, indicating Phelan was to continue in his previous appointment as an Assistant
Professor until May 31, and then serve full-time as a Research Assistant Professor until
June 30. His new appointment would be a terminal appointment as an Assistant Professor
from September 1, 2005 until May 31, 2006. The PAF was delivered to Phelan with
Eibeck's letter. 
7. Per the Regents' Rules, the members of the Faculty Committee can be appointed
from within or outside the membership of the TAC. TAC consists of five tenured faculty
members and two ex-officio members, the Provost, and a dean selected by the Provost's
Council. Both TAC and the Faculty Committee determine their own rules of procedure. 
8. The faculty grievance procedure set forth in Texas Tech OP 32.05 and TAC's
review of a non-reappointment set forth in Regents' Rule 04.02.8, are separate
proceedings. OP 32.05 1.b. states "[i]f the grievance is related in any way to tenure
decisions, the faculty member should refer to the Texas Tech University tenure policy," and 
"[g]rievances of faculty relating to admission of tenure, grounds for termination, termination
procedure, and notice of non-reappointment or termination are not to be covered by the
procedures noted below." Neither the grievance procedures nor Regents' Rules contain
any prohibition against the sharing of information or documents between the Grievance
Committee and TAC or their appointees in the event of simultaneous proceedings on
related subject matter or under any circumstances. Moreover, the sole limitation on
evidence presented in a grievance proceeding is the evidence "must relate to the
grievance." OP 32.05 4.c. Regents' Rule 04.02.8 contains no limitation on evidence that
may be submitted or reviewed by TAC.
9. Phelan contends Hall purposely provided TAC with a blackened, blurred,
unreadable copy of the Mid-tenure Review letter dated October 29, 2004, to obscure any
favorable comments related to Phelan's performance. Appellants attached a copy of the
letter reviewed by TAC as an exhibit to their motion for summary judgment. 
10. On deposition, Norville described "skullduggery" as "working behind the scenes."
11. With the exception of Ed Steinhart, all members of the Committee were present. 
Shacklette left the meeting early and did not vote. TAC has no rules related to quorums.
12. The lawsuit being referenced was not this lawsuit. Phelan had filed a
"whistleblower" suit against Texas Tech University on August 23, 2005.
13. Phelan's theories of recovery included assault, libel and/or slander, invasion of
privacy, conspiracy and/or aiding and abetting to tortiously interfere with his employment
contract and/or future employment, and denial of due process and/or conspiracy to deny
his due process rights.